## Case No. 9,144.

### The MARTHA.

[1 Blatchf. & H. 151.] [1]

District Court, S. D. New York. Sept., 1830.

SEAMEN—WAGES—DESERTION—FORFEITURE—VOYAGE ENDED—DISCHARGE OF CARGO — RIGHT OF ACTION NOT PERFECTED—COSTS—REHEARING.

1. The act of congress of July 20th, 1790, (1 Stat. 131,) makes desertion, carrying with it a forfeiture of wages, a statutory offence, and defines the evidence by which it is to be established.

[Cited in The Elizabeth Frith, Case No. 4,361; Granon v. Hartshorne, Id. 5,689; The Union, Id. 14,347. Cited in note to Gifford v. Kollock, Id. 5,409. Cited in The John Martin, Id. 7,357; Murray v. The F. B. Nimick, 2 Fed. 88; Welcome v. The Yosemite, 18 Fed. 383.]

2. There can be no desertion after the voyage is ended. The voyage is ended when the vessel is safely moored at her last port of discharge.

[Cited in The Elizabeth Frith, Case No. 4,361; Granon v. Hartshorne, Id. 5,689.]

3. Fifteen days will be taken to be a reasonable time for a vessel to unload in ordinary cases, and. where, for wages due on the delivery of the cargo, a vessel was arrested on the fourteenth day after she was moored in her port of discharge, the suit was dismissed as prematurely brought.

[Cited in Granon v. Hartshorne, Case No. 5,-689; The David Faust, Id. 3,595.]

4. There is no distinction between what is necessary to constitute the delivery of a cargo where it is owned by a freighter, and where both ship and cargo belong to the same person.

5. The mere offer of a master to pay a seaman's wages is not necessarily an admission that the wages are due and payable.

6. A libel brought before the right of action is perfected, must be dismissed, if duly excepted to on that ground. though such right becomes perfected during the progress of the suit. The case of Thompson v. The Philadelphia [Case No. 13,-973] examined.

[Cited in Eight Hundred and Forty-One Tons of Iron Ore, 15 Fed. 618; Henderson v. Three Hundred Tons of Iron Ore, 38 Fed. 40.]

7. Courts of admiralty will dispose of the question of costs according to the general equities of the case.

[Cited in Lubker v. The A. H. Quimby, Case No. 8,586; Shaw v. Thompson, Id. 12,726.]

8. Where a dilatory plea was joined with a defence upon the merits, and the libel was dismissed upon the former, though it would have been sustained upon the latter, it was dismissed without costs.

9. The court will not allow its recollections or impressions of verbal consents and understandings between counsel, not entered in its minutes, to interfere with or control the rights of parties.

10. A court of admiralty will not, except with the free consent of all the parties to be affected, grant a rehearing, or modify its definitive decree, after the term in which the decree is rendered.

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

If the court has the power to do so, such a practice has not been adopted.

[Quoted in The Illinois, Case No. 7,003. Cited in The Lizzie Weston, Id. 8,425; The Major Barbour, Id. 8,984; Snow v. Edwards, Id. 13,145.]

[See In re Dupee, Case No. 4,183.]

11. A decree made on a rehearing without such consent, modifying a final decree made at a previous term, was held to be a nullity.

[Cited in The Illinois, Case No. 7,003.]

12. Semble, that a consent to a rehearing by the parties to a suit, will not affect the rights of a surety in a stipulation for costs, who has been discharged by a previous final decree.

[Cited in Lubker v. The A. H. Quimby, Case No. 8,586.]

The libellant shipped as seaman on board the ship Martha, at New Orleans, for a voyage to Laguyra, thence to one or more ports in Europe, and back to a port of discharge in the United States. One of the printed stipulations in the articles signed by him was as follows: "And it is further agreed that no officer or seaman belonging to the said vessel shall demand or be entitled to his wages, or any part thereof, until the arrival of the said vessel at her last above-mentioned port of discharge, and her cargo delivered." The vessel arrived at New-York on the 21st of February, and was moored on the 22d. On that day the libellant left the ship without permission, and did not return to his duty, and on the same day his absence was entered by the mate in the log. The cargo was not entirely discharged until the 12th of March. On the 5th of March the libel in this action was filed in rem for the recovery of wages, and on the 8th the monition was issued and the vessel was arrested. The defence was, that the wages were forfeited by the desertion of the seaman, or, if not forfeited, that the right of action for them had not accrued at the time the suit was instituted.

Erastus C. Benedict, for libellant.

John Anthon, for claimant.

BETTS, District Judge. The payment of wages to the libellant is resisted, upon the ground that he deserted the vessel, and thereby forfeited his wages; and this conduct on his part is said to have worked a forfeiture, both under the penalties of the law maritime and under the provisions of the act of congress of July 20th, 1790. 1 Stat. 131.

I have several times ruled that the desertion of seamen from the merchant's service, so as necessarily to work a forfeiture of wages, has now become a statutory offense, and must be established in the mode designated by the act of congress. The inquiry, therefore, will not be, whether the particular act of malfeasance charged upon the libellant constituted an offence under the maritime law, which carries with it, as its appropriate punishment, a deprivation or abstraction of wages, but whether it comes within the provision of the statute. so that the judgment of forfeiture is the only one the court can pronounce.

It is a well-understood rule in the construction of statutory law, that when new conditions or requirements are imposed in respect to existing offences, so that those acts constitute the offence which would not have constituted it before, the statute necessarily becomes the exclusive rule, and abrogates or supplants the preceding one. The thing prohibited is no longer an offence, except as it is brought within the terms of the act. Castle's Case, Cro. Jac. 644; Reg. v. Wigg, 2 Salk. 460; Rex v. Robinson, 2 Burrows, 799. If this be so with regard to offences at common law, where the familiarity and notoriety of the common law rule would more safely admit statutory regulations to be considered as subsidiary, it should apply with inflexible strictness to maritime cases, where the customary law is to be sought for in obscure and remote usages, practised not by our own people, but by foreigners, and in periods of comparative ignorance and barbarism.

When congress assumed to legislate in respect to the offence of desertion by mariners, and its consequences to them, it can hardly be supposed that they designed merely to introduce another particular within the limits and penalties of that offence. What the exigencies of the case demanded of the legislature was a clear and precise designation of the duties and responsibilities of seamen in the merchant's service, and especially those most prominent ones, their obligation to the vessel, and their liability to the loss of wages for the breach of it. The uncertainty of the maritime law, as to what constituted a desertion, was alike vexatious and injurious to owners and seamen. Was a mere leaving of the ship without permission a desertion? or, if not, how was the animus revertendi to be ascertained? What was the rule which would protect the seamen from the resentment of an exacting master, and the ship from a heedless or wrongful abandonment by the crew? The question was never settled merely by lapse of time, and accordingly controversies were incessant whether the master might regard the shortest unjustifiable absence as a desertion, or the men purge the longest by a lagging and reluctant return. The statute meets this difficulty. It looks to the fact of absence without leave, and marks that as the characteristic of desertion. With whatever purpose of mind to return the seaman may have withdrawn himself, still his going from the ship without leave supersedes all inquiry into the quo animo. The law, however, makes the reasonable allowance of forty-eight hours within which the sailor may come back, and be only subject to the loss of three days' wages for his misfeasance. And, furthermore, most effectually to guard the seaman from the resentment of the master, excited by any subsequent occurrences, it takes from the latter the power to revive such act of misconduct, or to change that into a desertion which was not so regarded at the time, by requiring that the absence shall be entered on the log-book on the day it occurs, and that the entry shall state the absence to be without leave. This was a most provident regulation. One-half of the attempts of masters to bar seamen of the recovery of their wages, which have passed under the observation of this court, are founded not directly upon the act of misconduct alleged, but are excited by some after occurrence, as a prosecution for wages or for assault and battery, or by some irritation of personal feelings on the part of the master or his officers, under the influence of which the master seeks to give to all preceding misconduct of his men the most odious colorings, and to demand a forfeiture of wages for alleged desertions not denounced as such at the time they occurred. The courts, therefore, for the protection of seamen, exact from the master the most rigid compliance with the requisitions of the act in this behalf. Malone v. Bell [Case No. 8,994]; Jones v. The Phoenix [Id. 7,489]; Herron v. The Peggy [Id. 6,427]; The Phoebe v. Dignum [Id. 11,110]. In my opinion, the statute has specified and defined the desertion by seamen which necessarily incurs a forfeiture of wages, and no desertion having that effect can be established against seamen, except conformably to the statutory directions. In this country, the point is governed by positive law, and all codes or usages of other nations, which are conflicting or inconsistent with the statute, are to be disregarded. The provisions of the statute are broad enough to meet every case, and I cannot suppose that congress meant to legislate respecting heedless and frequently inadvertent absences, and to convert these into desertions, and, at the same time, leave the greater offence of a wilful abandonment of the ship, to the uncertain rules and dogmas of the maritime law as previously administered, that is, to be punished by a simple mulct or abstraction of wages, at the discretion of the court.

The inquiry, therefore, is, whether the act now in proof is such a desertion, and whether it is established by such proof as the statute directs. It must be borne in mind, that it was after the full arrival of the vessel at her port of discharge in the United States that the seaman left her. She reached this as her last port of discharge, from a circuitous voyage, on the 21st of February, and was safely moored on the day following. This, in nautical acceptation, was ending the voyage. The voyage denotes the transit to be performed by the seaman, and it is in this sense that the term is used in the law maritime. Emerig. Cont. de la Grosse, c. 8, § 1; Frontine v. Frost, 3 Bos. & P. 302; The Baltic Merchant, 1 Edw. Adm. 86. The seaman is usually bound by his articles to continue with the vessel and unlade her, and perhaps his obligation to perform that service might, under the maritime law, be regarded as incident to his hiring. The Baltic Merchant, 1 Edw.

Adm. 91. Yet, in so doing, he is considered as fulfilling a specific engagement of service, direct or implied, and not as continuing the voyage. The vessel being securely moored at her port of destination, the duties of mariners, as such, are fulfilled, and any further acts of theirs become those of stevedores or laborers, and the seamen are bound to perform them only by force of special stipulations in the shipping articles. Cons. del Mare, c. 74, No. 144. A neglect or omission of this duty may be appropriately punished by deductions from former earnings. The Baltic Merchant, 1 Edw. Adm. 92. And the earnings payable for the performance of one duty, may well be made chargeable for neglect to perform the other, because the agreement, though consisting of two parts, is entire in its object and effects. The act of congress is in harmony with this distinction between the termination of the voyage and the unlivery of the cargo, though it requires the two things to concur to entitle the seamen to sue for their wages. Act July 20, 1790, § 6 (1 Stat. 133).

In my judgment, the offence of desertion under the statute, which carries with it the absolute forfeiture of wages, can only be committed during the continuance of the voyage, and must accordingly take place anterior to the safe mooring of the vessel at her last port of delivery. As, then, in the present case, the seamen left the vessel after her voyage ended, their departure did not constitute the desertion contemplated by the act, which must be punished by forfeiture of wages, clothing, &c. I do not, therefore, consider it necessary to pass upon the sufficiency of the entry in the log in this instance, because, if sufficient, it has relation to a period of time after the voyage was ended in nautical acceptation, and when the offence could not be committed. This decision will not, however, exonerate seamen from proper responsibility for such offences. The articles themselves make adequate provision for such a case, and the principles of maritime law, which are not superseded by positive legislation, provide sufficient punishment for malfeasances of this character. It is competent for the court, in either aspect of the case, to decree, by way of abstraction of wages, a suitable compensation to the owner for the unfaithfulness or misconduct of the seamen; and I am persuaded it will in practice be found as efficacious, in holding seamen to fidelity in their engagements, to lessen the amount they receive at the end of the voyage, as to strip them and their families of all pay for services during the entire voyage, together with their savings laid up in clothing.

A further objection taken to the suit by the claimant is, that the right of action had not accrued when the suit was instituted. By a stipulation in the articles, the wages were not to be paid until the cargo was delivered. The delivery was not completed until several days after the action was commenced. But there need not in every case be an actual unlading of the cargo, to constitute the delivery contemplated by the agreement. If the consignee should refuse to accept the cargo, or unreasonably delay its discharge, the seaman cannot by such acts lose his rights, and would be considered as having complied with his stipulation by delaying his suit a reasonable time. What is a reasonable time for the unlivery of cargo is not made certain by any fixed rule of law. By the 52d article of the Laws of Wisbuy, from eight to fifteen days are allowed, according to the circumstances of the voyage. By the 21st article of the Laws of Oleron, the same period is allowed for a vessel to discharge. 1 Pet. Adm. App. End. The laws of the United States require every vessel under three hundred and fifty tons burden, to be discharged of her cargo within fifteen working days after her report in her port of discharge, and every vessel over three hundred and fifty tons, within twenty working days, and the vessel is to be reported within twenty-four hours after her arrival. Act March 2, 1799, §§ 30, 56 (1 Stat. 649, 669); Act March 3, 1821 (3 Stat. 640). Following the spirit of these statutes, the district court in Pennsylvania often allowed fifteen days, and sometimes more, to unlade the cargo, before the seaman's right to claim wages was perfected. Edwards v. The Susan [Case No. 4,299]; Thompson v. The Philadelphia [Id. 13,973]; Swift v. The Happy Return [Id. 13,697]. The voyage ends for the seaman when the vessel is moored. She is then, in judgment of law, in a condition to unlade at once. In our chief ports, it would rarely happen that twenty working days would be expended in unlading the largest ship. The statute has allowed time amply sufficient to cover any delay in obtaining permits from the custom-house, or in placing the vessel in a position to begin her actual discharge after her report is made, or in providing for other contingencies which may occasion loss of time. In Massachusetts, the rule seems to be general to allow the statutory period for discharging the vessel, without regard to the special circumstances of the case. Abb. Shipp. 456, note. There is convenience in this analogy, but I do not think a too implicit obedience should be paid to it, and I am disposed to follow the rule in the Pennsylvania district, allowing special circumstances to abridge or prolong the time of unlading, but adopting fifteen days as a fair average period. In this case, even if the action be considered as having been commenced by the issue of the monition, but fourteen days had elapsed, and two of those were Sundays. No special circumstances are in evidence, calling for an abridgment of the ordinary time. On the contrary, a proper degree of despatch is proved, and, considering the state of the weather, the vessel was unladen in a reasonable time. Since, then, sufficient time for

the unlading of the cargo had not elapsed when the suit was instituted, and since, also, it was commenced before the time fixed by statute for the unlivery of the cargo had expired, it must be held to have been prematurely brought.

This objection of the claimant being well taken, and no motion to amend or rectify the proceedings having been made or granted, I cannot, in the present shape of the pleadings, enter into an adjustment of the amount of wages due the libellant, or fix what compensation, if any, he ought to make the owners for withdrawing his services from the vessel. The action in this form must be considered as dismissed or suspended. But the main defence, which rested on the charge of desertion, having been gone into by the claimant, and decided in favor of the libellant, and the libel being stayed upon a point of form, in respect to other particulars, and not on the merits litigated between the parties, I shall give the libellant leave to file a new libel, or supplementary allegations to the one before the court, and to offer further proofs in the cause to show that he had a full right of action when his suit was commenced; and the final decree in the cause upon the merits, and the disposition of costs, will be deferred until the reformed pleadings and new proofs come in. The practice authorized by this decision is intended to be carried at present no further than the necessity of the particular case; that is to say, the claimant having given the court cognizance of the cause by intervening and contesting the question of forfeiture, and that jurisdiction still continuing after the libellant's right to sue for wages has matured, the latter will be permitted now to frame his libel so as to meet the objection that the recovery of wages cannot be had in the present form of the pleadings.

The libellant, under the above permission, filed several additional articles, alleging: (1) That the claimant of the ship was sole owner of her cargo, and that, as matter of law, the arrival of the vessel was a delivery of her cargo, within the meaning of the contract; (2) That the cargo might, with ordinary diligence, have been unladen, and the vessel discharged, within ten days from her arrival; (3) That no provision was made on board the vessel, or elsewhere, by the master or owner, for the support of the libellant until his wages were payable; (4) That previous to the commencement of any proceedings for the recovery of wages, the master called on the libellant's proctors, and told them that the libellant's wages were ready for him. The libellant proved the facts set up in the first and fourth allegations, but failed to prove those set up in the second and third.

Edwin Burr and Erastus C. Benedict, for libellant.

Gerardus Clark, for claimant.

BETTS, District Judge. It is contended that the terms of the shipping agreement were fulfilled, as the cargo was in fact delivered before the suit was brought. It is supposed there is a distinction in respect to the delivery of a cargo where it is shipped by a freighter, and where both ship and cargo are owned by the same person. It is not denied, that in the former case there must be an actual unlading to constitute a delivery; while it is argued, that in the latter, when the ship returns to the port of the owner, the cargo comes into his possession in such manner as to amount to a delivery of it from the ship. I cannot perceive any legal ground for the distinction. The contract of the seaman has no regard to the legal delivery of the cargo, which constitutes a change of property in it. It is as much the property of the consignee, and delivered in point of law, when it is shipped at the port of departure, as when it is unladen at the port of discharge. Dawes v. Peck, 8 Term R. 330; Dutton v. Solomonson, 3 Bos. & P. 582. To construe this clause of the shipping contract to mean a delivery in law, would be to hold that it was satisfied the moment the cargo was laden on board. The delivery referred to in the contract denotes the unlading of the vessel, frequently called, in the maritime law, the unlivery of the cargo. The other provisions of the contract import this. The mariner is not to leave the vessel until she be discharged of her lading, nor to receive his wages until her arrival at the last port of discharge, and the cargo delivered. The delivery of the cargo is made a distinct thing from the arrival of the vessel, and that delivery is the discharging her of her lading. The shipping articles are intended to correspond in substance with the provisions of the statute in this respect, and the court will always endeavor, in interpreting the articles, to enforce that conformity. By the 6th section of the statute, (Act July 20, 1790, 1 Stat. 133,) the seaman becomes entitled to his wages "as soon as the voyage is ended and the cargo or ballast be fully discharged at the last port of delivery." It is no less important to the shipowner, when he is his own freighter, to have an opportunity to ascertain the condition of the cargo, and detect embezzlements, and charge them, if discovered, upon the crew, than when he is merely a carrier for others. It would also be usually not less desirable for him to have reasonable time to raise funds to meet the charges of the ship, when the cargo is his own, than when those funds are to be collected from freighters. In both points of view, it would be in consonance with the character of the service of seamen, that their wages should not be payable until the actual delivery of the cargo, or until a reasonable time for that purpose had elapsed, and a stipulation on their part to that effect would be appropriate to their character and obligatory upon them.

It is further contended, on behalf of the

libellant, that the offer of the master to pay the wages is evidence that he recognised and admitted the libellant's discharge, and that he was entitled to demand them. But the mere offer of the master to pay the wages, in the way in which it was made in this instance, cannot properly be understood as an admission of any legal liability on his part. It was stated on the argument, (and the fact would be implied under the proof,) that the libellant's proctors had made application to the master, and demanded payment of these wages. He knew that a litigation must ensue, unless the claim was satisfied, and his declaration, under these circumstances, that if the libellant would call at a designated place, his wages were ready for him, ought not to be construed into an admission that wages were due at all, much less that they were due and payable because the libellant had fulfilled his engagement and was discharged from the ship. There was a dispute, and a heated one, respecting the libellant's claim to wages. Under these circumstances, it would be a most strained and harsh interpretation of the language of the master, to consider it as having admitted the absolute right of the libellant. Admitting the declaration of the master to have been an offer to pay, it was a qualified, or conditional one; and I do not think it imported any thing more than that the master would rather pay the sum demanded, at a place convenient to him, than litigate the question with the sailor. Such concessions and admissions are never received as waiving any legal defence of the party. The courts encourage attempts at compromise and settlement, and will not permit any act done or language used on such occasions to work a prejudice to the party making the effort. 2 Starkie, Ev. 38, and note g. The nisi prius case of White v. Mattison, 2 Starkie, 325, before Lord Ellenborough, if it forms an exception to this general rule, is distinguishable from the present case; for there the defendant had called up the whole ship's crew to pay them off, and had tendered the plaintiff a specific sum, and the court held, that the seaman might recover that sum, although the period limited by the shipping articles had not expired. There was a plain, unqualified admission of a debt to a certain amount, accompanied by an offer to pay that particular part, and the recovery was limited to the sum so admitted to be due, and did not cover the whole of the plaintiff's demand. I do not think that the circumstance proved in the present case, establishes the libellant's right to sue, or in any way implies that the master recognised that the libellant had been discharged from the ship, or otherwise exonerated from the restriction as to the time when he would be entitled to wages; nor do I regard it as a waiver of the advantage secured to the master by the contract.

A point of practice respecting the authority of the court over the proceedings, as they now stand, presents itself at this stage of the cause. It was not adverted to on the argument, and, in deciding it now, for the purpose of disposing of this cause, I do not intend to preclude the further consideration of the point, should it be presented in another case. It is, whether the libel ought to be absolutely dismissed, or whether the suit may be continued as properly in prosecution since the expiration of the fifteen days.

The matter of defence now in question is no extinguishment of the libellant's claim. A forfeiture of wages has not been incurred, and no payment is established. The claimant, therefore, upon the proofs, stands justly indebted to the libellant for his services as a mariner on board the vessel. If the latter cannot recover his demand in the present action, it will be only for the reason that the claim was not suable when the action was instituted. Courts of admiralty deal liberally with suitors in matters of practice. They give the most favorable interpretation to pleadings, in order, if possible, to support them, and, when a libel is found defective or inapt, instead of dismissing it for such cause, they will even enjoin the promovent to exhibit another libel, clear and properly articled, in order that the case may be determined according to right and justice. 1 Browne, Civ. & Adm. Law (2d Ed.) 462; The Adeline, 9 Cranch [13 U. S.] 245, 284. This practice should probably be considered as having relation to the form of the libel, and as coming under the principle of amendments, which are freely allowed in those courts. Consett, Ecc. Prax. pt. 3, c. 1, § 1, art. 2, and Id. § 2, art. 2; The Caroline v. U. S., 7 Cranch [11 U. S.] 496; The Anne v. U. S., Id. 570; The Divina Pastora, 4 Wheat. [17 U. S.] 52; The Mary Ann, 8 Wheat. [21 U. S.] 380; The Marianna Flora, 11 Wheat. [24 U. S.] 1, 38. Judge Peters has given a wider application to this power of a court of admiralty over its proceedings, than usually obtains. In Thompson v. The Philadelphia [Case No. 13,973], he says: "In this case, although the ship had ended her voyage more than fifteen days, yet, it having been alleged, and not denied, that due diligence had been used, but the vessel could not be unloaded, I give further time for payment." The report of that case indicates a suit in ordinary progress, and the language of the judge imports that he will stay the cause until the time shall arrive when it ought to have been commenced, and will then proceed in it as if the cause of action had been mature when the suit was instituted. I am not prepared to carry the discretionary authority of the court to that extent. It goes far beyond all the doctrines respecting the mere correcting of defects occurring in the frame of pleadings or in the order of proceedings. It assumes that a party brought into court without right on the part of the promovent, may still be detained there until an adequate right is acquired, or, if one is already inchoate, until it

ripens for enforcement. When the objection is presented distinctly and in proper order, I apprehend that every court must dispose of the controversy before it according to the rights of the respective parties as they stood when the suit was instituted. This is so at law and in chancery, and it is not perceived that any clear principle, recognised in the Civil Code, varies the rule in tribunals which have adopted that law.

In causes of civil and admiralty jurisdiction, every matter of exception which goes only to delay the suit, must be urged previous to contestation of suit, (Consett, Ecc. Prax. pt. 3, c. 1, § 2, and Id. c. 2; Cockb. Ecc. Prax. c. 6, §§ 1–7; Clerke, Ecc. Prax. tits. 31, 32,) and should be singly disposed of before contestatio litis, or before bringing the substantive parts of the suit ad judicium (2 Browne, Civ. & Adm. Law, Ed. 1799, 104, 185; Pothier, Traité de la Proc. Civ. pt. 1, c. 2, § 2, art. 1). The matters of exception, however, which bar recovery, may, by the French practice, be urged after contestation of suit. Id. art. 2. So they may be, also, in ecclesiastical and admiralty causes at this day, though Browne questions whether such a practice was allowable in the ancient Roman law. 2 Browne, Civ. & Adm. Law (Ed. 1799) 27, note. The result of these doctrines seems to be this, that in all the courts, if a party goes to trial upon the merits, he will not be permitted, after judgment, to avoid the recovery, by bringing forward an exception that no cause of action existed when the suit was instituted; but that that defence is open to him down to the time of trial, and that, if it is established, the consequence will be to turn the prosecutor out of court. The decision of Judge Peters will, therefore, stand an isolated one upon this branch of procedure, unless it is to be understood as having been given before answer filed, or on a preparatory examination before the judge, out of court, to ascertain whether admiralty process should be allowed. In the latter case, there may be a propriety in the judge's deferring the award of process, or, as it is put in the case reported, giving further time for payment. I should be inclined to understand that decision as made in an initiatory proceeding, rather than in an adjudication between parties litigating in court upon pleadings properly interposed. It does not appear to me to be consonant to the nature of actions in full prosecution, to permit them to be stayed until the plaintiff possesses himself of a right to what he demands; nor to allow him to go to judgment, against the objections of the opposite party, upon rights which have accrued during the progress of the cause and after a defence has been put in. The amendment or privilege allowed the libellant by the former order of the court in respect to his libel, had relation to the manner of pleading and proving his demand, to bring it into a condition to be enforced. It did not authorize him to go on in this suit upon a right which was not in existence when it was brought. I shall, therefore, not decree for these wages, although they have now become due, and although the claimant is liable to pay them. The libellant should not have arrested the vessel until his right of action was perfected; and the objection that she was not liable to arrest, having been duly taken and maintained by the claimant, must prevail. It is not intended to be decided that the same rule will necessarily apply, when the claimant gives his stipulation and makes his answer after the right of action has been perfected.

A further question remains, namely, whether costs shall be allowed or not. If the claimant had pleaded, in a formal manner, a dilatory plea that the suit was prematurely brought, he would undoubtedly be entitled to a decree for costs. But when, instead of pleading that plea by itself, he connects it with other matters of defence which go to the whole merits of the action, and requires full proof to be produced, it becomes questionable whether he is entitled to costs. In the main defence upon which he relied he has failed, and he prevails only upon an exception in the nature of a plea in abatement. Moreover, though the libellant has failed to prove his supplemental allegation, that the vessel might with ordinary diligence have been discharged in ten days, yet he has offered some evidence upon that point, which shows that there was probable cause for his supposing that his right was perfected, depending, as it did, upon the question of a reasonable time for unlading. Courts of equity dispose of the question of costs according to the justice of the case, in the sound discretion of the court; Nicoll v. Trustees of Town of Huntington, 1 Johns. Ch. 166; and courts of admiralty follow the same rule. I shall, therefore, in view of the general equities of the case, dismiss the libel without costs.

After a decree was entered in accordance with the foregoing decision, and in the following term, the counsel for the claimant applied to the court for leave to re-argue the question of costs, and a manuscript decision of the circuit court was produced, overruling the doctrine of this court upon the question of desertion, and holding in effect, that absence from the vessel without leave, after the voyage was ended, but while the cargo was yet undischarged, was a desertion, carrying, as a consequence, the forfeiture of all wages then earned; whereupon, in obedience to that ruling, and after hearing counsel on both sides, it was decreed by this court that costs should be awarded to the claimant. On a subsequent day, a motion was made by the claimant for a summary decree, and for execution upon the stipulation of the surety for costs on the part of the libellant. This was resisted, upon the ground that the decree awarding costs to the claimant was against the libellant, and did not affect his surety.

The affidavit of the counsel for the claimant stated, that within a few days after the decree dismissing the libel without costs was rendered, he applied to the court for leave to re-argue the question of costs, and that the question was subsequently argued by the counsel on both sides, and a decree was entered dismissing the libel, with costs. The affidavit of the counsel for the libellant stated, that immediately after the first decree was rendered, he apprized the surety that he was no longer liable for costs upon his stipulation; that he, the counsel for the libellant, had no authority to waive the rights of the surety under that decree; that, in the subsequent argument upon the question of costs, he contemplated nothing but the interest of the libellant, and supposed that the object of the claimant was to recover costs against the libellant merely for the purpose of extinguishing the wages. The affidavit of the surety stated, that he had given no consent or authority to waive his advantages under the first decree. Upon the facts proved, it was contended for the libellant that the second decree was nugatory and void, or, if not void, that it only availed as against the libellant himself, and that such was the understanding at the time. The counsel for the claimant contended that the second decree was valid, and carried costs against the surety, and that the question of costs was re-argued with that understanding, and he appealed to the recollection of the court to sustain that view of the case.

BETTS, District Judge. The court constantly sees the mischiefs attending efforts to carry on litigated causes by mutual understandings between the counsel concerned in them. I have uniformly declined acting upon such arrangements, unless their result was put in writing, or stated upon the minutes of the court. Nor will I allow my own recollections or impressions as to particulars which have passed in the presence of the court, to interfere with or control rights that may ultimately be brought up for decision. I should certainly never have allowed the argument in this cause to proceed, unless I had supposed that the whole case was under the control of the court, and that the former decree stood suspended until a decision could be had upon the question of costs. Yet, there appears to have been no act of the court bringing the matter within its control, or assuming cognizance of it, other than hearing the counsel for both parties upon that question. The proposition now before the court is, whether a court of admiralty, after entering a definitive decree, can, of its own authority, re-hear the cause or modify the decree, at any time subsequent to the term in which the decree is rendered. Although the court proceeded, in this case, upon a supposed assent of the libellant, yet nothing appears apud acta establishing such assent, or concluding his rights. The proceeding in this

case had all the character and effect of a re-hearing. The cause had been disposed of. No reservation of any question had been made, so as to render the decree in any respect interlocutory. A definitive decree, entered on the 26th of August, was changed by force of another decree applied for on the first Tuesday of September. The objection is now specifically taken, that it was incompetent for the court to vacate the preceding decree in that manner.

The course of procedure in the ecclesiastical and admiralty courts in England, does not furnish us with any satisfactory guide on this inquiry. The judge usually renders judgment there after summons to the party to be present to hear it. If he does not appear, there is a succession of decrees of contumacy, and then the decree passes as if by default. If he appears, he must eo instanti present his claims for an alteration of the decree, otherwise it becomes definitive. Consett, Ecc. Prax. pt. 3, c. 6, § 2; Clerke, Ecc. Prax. tits. 232, 234. In the French practice, which conforms very closely to the civil, the judgment becomes perfect as soon as it is pronounced, and the judge cannot correct it after the rising of the court, and after the register has entered the judgment upon the minutes as it was given. Pothier, Traité de la Proc. Civ., c. 5, art. 2. The only case recognised in the early practice of the ecclesiastical courts, in which the same court can revoke its sentence, is where, when the party is cited to show cause why sentence should not be executed, he alleges the nullity of the former decree; and this. whether the former decree was one made by another and a higher court, or by the same court. Cockb. Prax. c. 15, §§ 8, 9. Such, too, appears to be the modern practice. Sir John Nicholl doubts whether the court is competent to rescind a sentence against the wishes of the party obtaining it. And that doubt was strongly expressed in a case where a question of costs had been reserved, and where the application to open the previous decree was made on the day assigned for hearing that reserved question. Thomas v. Maud, 1 Addams, Ecc. 481. This principle seems to be incorporated into the practice of the admiralty courts. In a prize cause, Sir William Scott reserved his opinion upon the question whether he could revoke a previous decree in the cause, but under a pointed intimation that it was a proceeding wholly unknown to the court. The Vrouw Hermina, 1 C. Rob. Adm. 163.

The ordinary rules of practice in the supreme court deny a rehearing of a cause after the term in which judgment is pronounced. Hudson v. Guestier, 7 Cranch [11 U. S.] 1. And some of the cases imply a doubt whether, after a definitive judgment pronounced, the court can revoke or reconsider that judgment. See The Fortitudo, 2 Dods. 58, 70; Smith v. Jackson [Case No. 13.064]; Norton v. Rich [Id. 10,352]. The court of chancery allows a rehearing, upon sufficient reasons, at any

time before decree enrolled, and it has been permitted at the distance of twenty-four years from the time the decree was rendered. Har. Prac. K. B. 341; Mills v. Banks, 3 P. Wms. 8, and note. But this practice has never been introduced into the courts of common law or of admiralty, though I am not aware of any defect of authority in this court to establish such a rule. The character of the suits usually prosecuted here, would, however, deter the court from adopting that practice, unless the great ends of justice were put in hazard by withholding it. Usually, it is of the last importance to suitors here, to have an immediate despatch of their business. Seafaring men are not in circumstances to conduct protracted and reiterated litigations upon their claims, and it is usually better for their interests to have prompt decisions, even though adverse to their demands. Experience, I believe, fully justifies the remark, that whether in the instance or the prize court, every delay and appeal is of serious detriment to the mariner's interest. The sum in dispute is usually small, and of immediate necessity to the suitor. It is for his interest, therefore, that the most speedy decision possible should be obtained, and that, when it is adverse to him, he should rather go immediately to his employment than linger over the contingencies of a reconsideration of his case. These views have probably led to the exclusion from courts of admiralty of the practice referred to; and I concur in the sentiments of the eminent men sitting in the English admiralty and consistory courts upon this point, that it is a matter of great doubt whether a power of this description should be exercised in this court, without the free consent of all parties to be affected by it. The Vrouw Hermina, 1 C. Rob. Adm. 163; Thomas v. Maud, 1 Addams, Ecc. 481.

The fact of consent being expressly denied by the oath of the libellant's proctor, I cannot imply it from the subsequent proceedings, and must hold the last decree to be a nullity. The claimant may, however, if he wishes to have this point considered in the court above, have the stipulation delivered up to him, to be prosecuted in personam. Order accordingly.